# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ALASKA

LISE T.,[1]

                            Plaintiff,

      vs.

ANDREW SAUL,
Commissioner of Social Security,

                         Defendant.

Case No. 3:19-cv-00187-TMB

## DECISION AND ORDER

On or about October 3, 2017, Lise T. filed an application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("the Act") respectively,[2] alleging disability beginning September 9, 2017.[3] Ms. T. has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[4] On October 28, 2019, Ms. T. filed an opening brief.[5] The Commissioner filed an Answer and a brief in opposition to Ms. T.'s opening brief.[6] Ms. T.

---

[1] The Plaintiff's name is partially redacted in compliance with Federal Rule of Civil Procedure 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), *available* https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] The Court uses the term "disability benefits" to include both DIB and SSI.

[3] Administrative Record ("A.R.") 151, 158. The ALJ's decision cites October 2, 2017 as Lise T.'s application date. A.R. 14.

[4] Docket 1 (Compl.).

[5] Docket 14 (Lise T.'s Opening Br.).

[6] Docket 10 (Answer); Docket 19 (Def.'s Br.).

filed a reply brief on December 31, 2019.[7]  Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[8]  For the reasons set forth below, Ms. T.'s request for relief will be granted in part.

## I.  STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[9] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[11]  In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[12]  If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13]  A reviewing

---

[7] Docket 20 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920,

court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which he did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, 'the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity.'"[15]

## II. DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[16] In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[17] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[18]

The Act further provides:

---

921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] 42 U.S.C. § 423(a).

[17] 42 U.S.C. § 1381a.

[18] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[19]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[20] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[21] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[22] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert ("VE"), *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[23] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity."

*The ALJ found that Ms. T. had not engaged in substantial gainful activity since her alleged onset date of September 9, 2017.*[24]

---

[19] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[20] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[21] *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[22] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[23] *Tackett*, 180 F.3d at 1101.

[24] A.R. 16.

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.  *The ALJ determined that Ms. T. had the following severe impairments:  type 2 diabetes mellitus; coronary artery disease status post CABG; cardiomyopathy; and obesity.  The ALJ found that Ms. T.'s hypertension and renal failure were not severe impairments.*[25]

**Step 3.**  Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is/are the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.  *The ALJ determined that Ms. T. did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[26]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including impairments that are not

---

[25] A.R. 16–17.

[26] A.R. 17.

severe.[27]  *The ALJ concluded that Ms. T. had the RFC to perform sedentary work with the following limitations: occasional climbing of ramps and stairs; occasional stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or scaffolding; avoidance of concentrated exposure to non-weather related extreme heat, fumes, odors, dust, and poorly ventilated areas; avoidance of concentrated exposure to unprotected heights and hazardous machinery; and avoidance of moderate exposure to non-weather related extreme cold.[28]*

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.  Otherwise, the evaluation process moves to the fifth and final step.  *The ALJ found that Ms. T. was not capable of performing any past relevant work.[29]*

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.

---

[27] 20 C.F.R. § 404.1520(a)(4), 416.920(a)(4).

[28] A.R. 18–19.

[29] A.R. 24.

*The ALJ determined that there were jobs that existed in the national economy that Ms. T. could perform, including the following: call out operator; surveillance systems monitor; and table worker.*[30]

Based on the foregoing, the ALJ concluded that Ms. T. was not disabled from September 9, 2017, the alleged onset date, through March 7, 2019, the date of the decision.[31]

## III. PROCEDURAL AND FACTUAL BACKGROUND

Ms. T. was born in 1982; she is currently 37 years old.[32]  She reported last working as a cashier, stocker, and cleaner at Brown Jug in August 2017.  In the past, Ms. T. also reported working at Tesoro gas station as a cashier and stocker; at Carr's safeway as a cashier, cook, deli worker, and cleaner; at Subway making sandwiches; at Hula Hand's restaurant as a waitress and cook; and at DGS fleet services cleaning aircraft.[33]  Ms. T. initiated her applications for disability benefits on or about October 3, 2017.[34]  On March 27, 2018, the SSA field office found that Ms. T. was not disabled.[35]  On May 31, 2018, Ms. T. filed a request for hearing.[36]  On February 1, 2019, Ms. T. appeared and testified

---

[30] A.R. 25.

[31] A.R. 25–26.

[32] A.R. 151, 158.

[33] A.R. 49–55, 213, 216.

[34] A.R. 151, 158; *supra* note 3.

[35] A.R. 84.

[36] A.R. 92.

without representation in a hearing before ALJ Paul Hebda.[37] The ALJ issued an unfavorable ruling on March 7, 2019.[38] The Appeals Council denied Ms. T.'s request for review on June 5, 2019.[39] On June 29, 2019, Ms. T. appealed to this Court; she is represented by counsel in this appeal.[40]

*The Medical Record*

Although the Court is focused on the relevant medical records after Ms. T.'s alleged onset date, the following are the relevant records before September 9, 2017:

On April 19, 2017, Ms. T. established care with Alex Alonso, PA-C, at Anchorage Neighborhood Health Center. She reported abdominal pain and dysuria. She also reported not taking her diabetes mellitus medications "since November 2016." On examination, Ms. T.'s hemoglobin A1c test was 10.1. PA Alonso noted that Ms. T. was noncompliant with her diabetes mellitus medications and prescribed Metformin and Glipizide.[41]

On June 5, 2017, Ms. T. presented to the emergency department at Alaska Regional Hospital. She reported moderate chest pain with shortness of breath and lightheadedness. She reported intermittent chest pain from midsternum to left shoulder that began one week prior. Ms. T. had an abnormal ECG. The attending physician

---

[37] A.R. 37–40, 44–55.

[38] A.R. 11–26.

[39] A.R. 1–6.

[40] Docket 1, 14.

[41] A.R. 349–51.

considered the following diagnoses: cardiac ischemia, pericarditis, chest wall strain, pulmonary embolism (PE), anxiety, stress reaction, esophagitis, and thoracic aortic dissection, but also noted that "[n]o emergency medical condition is identified."[42]

After the alleged onset date of September 9, 2017, the more relevant medical records are as follows:[43]

On September 17, 2017, Ms. T. presented to the emergency department at Alaska Regional Hospital. She reported sharp, aching, constant chest pain with shortness of breath, abdominal pain, cough, subjective fever, chills, and leg swelling. On physical examination, her blood pressure was 141/92. The echocardiogram showed a "[s]everely decreased LV ejection fraction" estimated 15-20%; severe global hypokinesis; and severe left ventricular diastolic dysfunction. The treating physician assessed Ms. T. with acute, systolic and diastolic congestive heart failure; dilated cardiomyopathy "[m]ost likely nonischemic"; chest discomfort; prediabetes mellitus; tobacco use; and elevated troponin level. In the emergency room, she was given Lovenox, Lasix, aspirin, and was "started on nitroglycerin to lower her blood pressure." She was diuresed and lost 14 pounds. The chest x-ray showed "[m]ild cardiomegaly and prominence of pulmonary vasculature and mild diffuse reticular opacities suggestive of early congestive failure and developing lung

---

[42] A.R. 373–84.

[43] The Court notes that the administrative record contains multiple copies of medical records. To the extent possible, the Court will use the medical record that first appears in the administrative record.

edema. Correlate clinically as viral or atypical pneumonia may have a similar appearance."[44]

On September 25, 2017, Ms. T. saw Mario Binder, M.D., at Alaska Heart & Vascular Institute. On physical examination, Ms. T.'s blood pressure was 102/72. Dr. Binder diagnosed Ms. T. with combined systolic and diastolic heart failure; tobacco use; diabetes mellitus, type 2; and dilated cardiomyopathy.[45]

On September 28, 2017, Ms. T. initiated care with Wendy Sanders, M.D., at Anchorage Neighborhood Health Center. She reported burning foot pain. On physical examination, Dr. Sanders observed that Ms. T.'s blood pressure was "acceptable" with no tachycardia; she had a saturated oxygen level of 94% "after walking"; a cardiac exam with normal rate and rhythm; mild peripheral edema; and reported decreased sensation in the feet and ankles bilaterally and symmetrically. Dr. Sanders noted that Ms. T. was a prior patient at Anchorage Neighborhood Health Center, but had had no recent evaluations or follow-up, and had missed multiple previous appointments. She assessed Ms. T. with "long-standing severely uncontrolled diabetes, hypertension, hyperlipidemia" and acute severe diastolic and systolic renal failure, dilated cardiomyopathy, elevated troponin associated with demand mismatch, tobacco use, obesity, deconditioning, renal insufficiency, chronic pain syndrome; and narcotics contraindicated with congestive heart failure. Dr. Sanders noted that Ms. T. was "not cleared to work due to medical illness."[46]

---

[44] A.R. 230–52.

[45] A.R. 330–34. Ms. T. followed up with Dr. Binder again on September 27, 2017. A.R. 324–29.

[46] A.R. 341–45.

On October 11, 2017, Ms. T. saw Dr. Sanders. On physical examination, Dr. Sanders observed acceptable blood pressure, a normal cardiac rate and rhythm, no tachycardia, mild peripheral edema, subjective "decreased sensation of feet and ankles bilaterally and symmetrically." Dr. Sanders noted that Ms. T.'s recent laboratory tests showed mild renal insufficiency, elevated white blood cell count, no anemia, abnormal urinalysis, and abnormal urine culture with Escherichia coli. Dr. Sanders also noted that Ms. T. was at "[h]igh risk for progressive heart failure, renal insufficiency, pneumonia, pulmonary emboli, sepsis, and premature death."[47]

On October 20, 2017, Ms. T. followed up with Dr. Binder after a stress cardiac MRI on October 19, 2017. The cardiac MRI showed "[m]oderate to severely enlarged LV cavity size"; "[s]everely reduced global LV systolic function"; a quantitative ejection fraction of 27%; segmental wall motion abnormalities; reduced global RV systolic function; and moderate left atrial enlargement. Dr. Binder assessed Ms. T. with dilated cardiomyopathy; combined systolic and diastolic heart failure; abnormal cardiovascular studies; "quite significant cholelithiasis"; and CAD native vessel.[48]

On November 2, 2017, Ms. T. followed up with Dr. Sanders. On physical examination, Dr. Sanders observed that Ms. T.'s blood pressure was 123/90.[49]

On November 26, 2017, Ms. T. presented to the emergency department at Alaska Regional Hospital. She reported chest pain, shortness of breath, and loss of sensation

---

[47] A.R. 458–62.

[48] A.R. 469–77, 684–92.

[49] A.R. 453–56.

"to parts of her legs bilaterally." On physical examination, Ms. T. had a positive troponin level of 1.075, mild tachypnea, and tachycardia. The chest x-ray showed "possible edema" and the EKG showed "no clear ischemic changes."[50] The next day, Ms. T. underwent left heart catherization and selective coronary arteriography at Alaska Regional Hospital. On physical examination, her ejection fraction was 34%, but visually appeared as 25–30%. She was diagnosed with severe acute coronary artery disease in the right coronary artery ("RCN") and diffuse severe coronary artery disease in the left anterior descending artery ("LAD") and left circumflex coronary artery ("LCx").[51] On November 29, 2017, Ms. T. underwent percutaneous transluminal angioplasty and primary coronary stent placement "to the serial segments of subtotal occlusion of the descending dominant right coronary artery with the distal right coronary artery filling predominantly via left coronary collateral flow." Cardiologist Thomas Kramer, M.D., diagnosed Ms. T. with severe multivessel atherosclerotic coronary artery disease; dilated cardiomyopathy; combined systolic and diastolic heart failure, acute on chronic; unstable angina; subendocardial myocardial infarction by troponins; insulin dependent diabetic; long-time smoker; obesity; history of hypertension; history of dyslipidemia; and chronic kidney disease.[52] Ms. T. was discharged from Alaska Regional Hospital on December 1, 2017.[53]

---

[50] A.R. 396–403, 547–53.

[51] A.R. 404–05.

[52] A.R. 406–10.

[53] A.R. 566.

On December 14, 2017, Ms. T. followed up with Dr. Sanders for medication consultation and refills.  On physical examination, Dr. Sanders noted that Ms. T.'s blood pressure was "nicely low" with a low pulse and no evidence of atrial fibrillation.  Dr. Sanders observed that Ms. T. had a regular heart rate and rhythm and had mild peripheral edema.  Dr. Sanders noted that Ms. T. "just restarted insulin but is using it incorrectly."  She also noted that Ms. T.'s "[h]ome glucose levels are excellent with recent hospitalization and reduction in alcohol use."  Dr. Sanders opined that Ms. T. was not cleared to work, travel, drive long distances, fly, or fall on the ice.[54]

On December 15, 2017, Ms. T. followed up with Arron O'Callaghan, PA-C, at Alaska Heart & Vascular Institute, for "[h]eart failure follow up."  On physical examination, PA O'Callaghan noted that Ms. T. had a normal A-P diameter; normal heart rate and regular rhythm; normal S1 and S2 cardiac auscultation and no S3 or S4; and no lower extremity edema.  No medications were changed at the visit.[55]

On April 12, 2018, Ms. T. saw Elizabeth Hill Bryant, ANP, at Anchorage Neighborhood Health Center.  She reported not taking her diabetes medications for 7-10 days prior to the appointment "due to a move."  She reported back and foot pain and a substantial decline in alcohol use since November 2017.  Her most recent creatinine was 1.51, her blood pressure was well controlled, and she reported no chest pain, cough, headache, or dizziness.  Ms. T.'s hemoglobin A1c was 10% at the appointment.  ANP

---

[54] A.R. 463–67.

[55] A.R. 677–82.

Bryant observed no lower extremity edema. ANP Bryant noted that Ms. T. missed her last 5 appointments at her "Heart Failure Clinic."[56]

On April 18, 2018, Ms. T. saw Arron O'Callaghan, PA-C, at Alaska Heart & Vascular Institute. She reported chest pressure lasting 10-15 minutes at least once a week and believed that she had used nitroglycerin maybe five times in the last four months. PA O'Callaghan noted that Ms. T. had "been quite stable on goal-directed medical therapy for heart failure" and that her weight was up by 10 pounds since December 2017, but that she did not report palpitations, irregular heartbeat, feeling of heart pausing or fluttering, or lower extremity swelling, paroxysmal nocturnal dyspnea (PND), or orthopnea.[57]

On April 25, 2018, Ms. T. had an echocardiogram. Her ejection fraction was calculated as 46%.[58]

On May 2, 2018, Ms. T. followed up with PA O'Callaghan. PA O'Callaghan noted that Ms. T.'s ejection fraction had improved to 46% and "some [left ventricle] function has recovered with [guideline determined medical therapy]," but that Ms. T. continued to report chest pain multiple times each week.[59]

On May 18, 2018, Ms. T. saw Kenton Stephens, M.D., at Denali Cardiac & Thoracic Surgical Group for a consultation about coronary artery bypass grafting. She reported recurrent angina two to three times per week requiring nitroglycerine for relief. She also

---

[56] A.R. 495–501.

[57] A.R. 668–74.

[58] A.R. 617.

[59] A.R. 661–66.

reported "shortness of breath with walking on flat ground, working around the house, and walking up one flight of stairs."  On physical examination, Ms. T. had a regular cardiac rate and rhythm, normal blood pressure, "subjective dysesthesias in her fee," full and symmetric muscle bulk, and a normal gait.  Dr. Stephens opined that Ms. T. was "going to have difficult surgical revascularization challenges given the small size of her targets, her diffuse disease, and her impaired ventricular function."  He also noted, "[h]owever, given her young age, ischemic cardiomyopathy, and diabetes, I think there is a clear survival benefit for recommending surgery for her."[60]

On May 31, 2018, Ms. T. followed up with ANP Bryant.  At the visit, Ms. T.'s hemoglobin A1c was 9.2% and her blood pressure was low.[61]  On the same date, ANP Bryant completed a Health Status Report Form for the State of Alaska.  She diagnosed Ms. T. with insulin dependent diabetes mellitus; heart failure; CAO – renal failure; obesity; chronic pain; and alcoholism.  She indicated that it was "not safe to work" and that Ms. T.'s condition was expected to limit her ability to work for over 12 months.  ANP Bryant noted that Ms. T. was "being brought to a level of health where she can undergo open heart surgery."[62]

On June 19, 2018, Ms. T. saw Kristine Polintan, APRN, at Alaska Heart & Vascular Institute.  She reported exertional angina "that worsened over the weekend."  She also reported "significant lightheadedness which negatively impacts her ADLs."  APRN

---

[60] A.R. 525–28.

[61] A.R. 488–94.

[62] A.R. 482–83.

Polintan noted that the "EKG today showed NSR with non-specific lateral ST-T changes." She also noted that Ms. T. would "proceed with the planned cardiac catheterization in AM with Dr. Kelly."[63]

On June 20, 2018, Ms. T. underwent left heart catherization and selective coronary and femoral arteriorgraphy.[64]

On July 2, 2018, Ms. T. followed up with Dr. Stephens regarding a preoperative consultation for anticipated coronary bypass grafting. She reported "some chest pressure on a daily basis." Dr. Stephens noted that Ms. T. did not want to undergo the planned surgery, but also noted that he "explained the indication for surgery would be the presence of three-vessel coronary artery disease with ischemic cardiomyopathy in a young diabetic patient which would likely confer to her a survival benefit." Dr. Stephens also notified Ms. T. that she would need to be "very diligent with her cardiac medications for the remainder of her life."[65]

On July 9, 2018, Ms. T. saw Dr. Sanders for a prescription for a new glucometer. On physical examination, Dr. Sanders observed 97/63 blood pressure, a regular heart rate and rhythm, no peripheral edema, and a hemoglobin A1c of 9.2%. Dr. Sanders assessed Ms. T. with "[l]ong-standing poorly controlled insulin-dependent diabetes with hemoglobin A1c 9.2%"; chronic renal failure; multivessel coronary artery disease;

---

[63] A.R. 652–59.

[64] A.R. 775–81.

[65] A.R. 523–24.

cannabis abuse; and chronic medication noncompliance producing high risk for seizure, stroke, heart attack, and renal failure.[66]

On July 18, 2018, Ms. T. followed up with PA O'Callaghan. She reported continued exertional chest discomfort that resolved after 1-3 tablets of nitroglycerin. She also reported significant lightheadedness which negatively impacted her activities of daily living. After explanation, Ms. T. agreed to undergo surgery.[67]

On August 1, 2018, Dr. Sanders completed a Health Status Report Form for the State of Alaska. She diagnosed Ms. T. with poorly controlled insulin-dependent diabetes mellitus; chronic renal failure; severe heart failure; chronic pain; alcohol abuse; substance abuse; and cognitive dysfunction. Dr. Sanders opined that Ms. T. was not able to work full or part-time and her condition limited Ms. T.'s ability to work for more than 12 months.[68]

On August 30, 2018, Ms. T. underwent eight vessel coronary artery bypass grafting. She was discharged on September 6, 2018. The discharge instructions included a caution to "use sternal precautions for a minimum of 6–8 weeks post-surgical" and notification that she would require "several months to recover" and would "experience memory loss, find [she would be] easily confused, and struggle emotionally due to large hormone surges." The discharge instructions included a recommendation not to travel

---

[66] A.R. 484–87.

[67] A.R. 639–44.

[68] A.R. 503–06.

alone, limitations on lifting, and "that medications should be administered and monitored by someone other than the patient."[69]

On September 20, 2018, Ms. T. saw Cami Zobel, PA-C, at Denali Cardiac & Thoracic Surgical Group for post-surgery follow up. She reported "doing well" after surgery. PA Zobel instructed Ms. T. to "continue using sternal precautions for a full six weeks from the date of surgery" and then "slowly increase her pushing, pulling and lifting by about 3 to 5 pounds every three to five days as tolerated."[70]

On September 26, 2018, Ms. T. followed up with Dr. Sanders. She reported recent glucose levels as "good" with no written results. She also reported no fevers, sternal pain, chest pain, or heart fluttering. On physical examination, Dr. Sanders observed that Ms. T. looked "much healthier now than in the past 1 year"; had clear lungs; a regular heart rate and rhythm; and no peripheral edema. She observed that Ms. T. was alert, cooperative, interactive, more attentive, and able to review her medications accurately.[71]

On October 17, 2018, Ms. T. saw Mario Binder, M.D., at Alaska Heart & Vascular Institute. She reported trying to be more active and walking every day. She denied chest pressure, palpitations, severe dizziness or syncope. Dr. Binder noted that Ms. T. was "doing wonderfully" after her eight-vessel bypass surgery, had no evidence of "overt heart failure/volume overload today."[72]

---

[69] A.R. 512–15; 529; 538; 826–29.

[70] A.R. 529–32.

[71] A.R. 751–55.

[72] A.R. 619–24.

On October 31, 2018, Dr. Sanders wrote a letter opining that Ms. T. was not able to return to work. She also noted that it was "unlikely [Ms. T.] will work in the future due to severe cardiac disease."[73]

On December 17, 2018, Ms. T. followed up with Dr. Sanders for Alaska Medicaid paperwork. On physical examination, Ms. T.'s blood pressure was acceptable; she was alert, cooperative, interactive, more attentive, but looked "exhausted." Dr. Sanders also observed that Ms. T. had a regular heart rate and rhythm; no peripheral edema; hemoglobin A1c of 8.8%, which was "not at goal"; creatinine at 1.7; and GFR at 34 in recent renal function tests. Dr. Sanders noted that Ms. T. was "not cleared to work at this time due to 8 vessel coronary artery bypass, hyperglycemia associated with insulin dependent diabetes, chronic renal failure, ongoing tobacco and marijuana use at risk for stroke [,] seizure [,] heart attack [,] renal failure [,] and sepsis.[74]

On January 25, 2019, Dr. Sanders diagnosed Ms. T. with stable multivessel coronary artery disease with recent 8 vessel bypass and no evidence of recurrent angina or atrial fibrillation. Dr. Sanders noted that Ms. T.'s cardiac rehabilitation was pending. Dr. Sanders also diagnosed Ms. T. with long-standing poorly controlled diabetes with hemoglobin A1c at 8.8%; long-standing uncontrolled hypertension; long-standing tobacco use; chronic alcohol abuse, but Ms. T. denied use; marijuana use; postoperative anemia;

---

[73] A.R. 545.

[74] A.R. 745–49.

chronic renal failure; overweight status; and deconditioning. Dr. Sanders opined that Ms. T. was unable to return to work.[75]

The following record was submitted to the Appeals Council after the date of the ALJ's decision on March 7, 2019:

On May 29, 2019, Dr. Sanders provided a letter indicating that Ms. T. had been evaluated at the Anchorage Neighborhood Health Center "for the following conditions: IDDM, CAD, CHF, CRF, anemia, [and] upcoming surgery." Dr. Sanders opined that Ms. T. was not stable for work "now or in [the] next 12 months."[76]

*Hearing Testimony on February 1, 2019*

On February 1, 2019, Ms. T. appeared and testified before ALJ Hebda without representation. She testified that she was alleging cardiac issues, renal failure, diabetes, and anemia. She indicated that she lived with her two children and that her children's father and her niece helped with household chores and cooking. Ms. T. testified that her driver's license had expired. She reported that she "fainted the other day"; her medications made her dizzy and drowsy; and she had headaches; chronic pain; hearing difficulties; and numbness in her feet and hands. Ms. T. testified that in the past, she worked at Brown Jug as a cashier and clerk; at Tesoro gas station; for Carr's Safeway in the deli department; at Kappa's as a prep cook; at Subway; at Hula Hands restaurant; for

---

[75] A.R. 915.

[76] A.R. 7.

Blackstone Consulting as a cook and janitor; and for Gal Global Services as an aircraft cleaner.[77]

Steven Anderson, M.D., testified as the medical expert. Based on his review of the record, Dr. Anderson opined that Ms. T. had the following impairments: diabetes; chronic hypertension; coronary heart disease; history of congestive heart failure and cardiomyopathy; and renal insufficiency. He testified that Ms. T.'s current kidney function was adequate. Dr. Anderson also testified that in September 2017, "she had rather significant cardiomyopathy and congestive failure," but that most recently her ejection fraction was 46%, "which wasn't too bad." He noted that Ms. T. had no ongoing episodes or complaints of angina and that her hypertension "seems to be controlled with medication." Dr. Anderson opined that Ms. T.'s impairments individually and combined did not meet or equal a listing. He opined that Ms. T. would be limited to frequent lifting and carrying of 10 pounds; standing or walking two hours out of an eight-hour workday; sitting six hours out of an eight-hour day; pushing and pulling up to 10 pounds; occasionally climbing ramps and stairs; never climbing ladders, ropes, or scaffolds; occasionally stooping, kneeling, crouching, and crawling; avoiding moderate exposure to extreme cold; avoiding concentrated exposure to extreme heat; and avoiding concentrated exposure to fumes, dust, poor ventilation, hazards, and unprotected heights.[78]

---

[77] A.R. 37–40; 44–55.

[78] A.R. 40–44.

William Weiss testified as the vocational expert. Based on the ALJ's first hypothetical,[79] VE Weiss opined that Ms. T. would not be able to perform her past work, but could perform work as a callout operator, surveillance system monitor, and table worker.[80]

*Function Report*

Ms. T. completed an undated function report.[81] She indicated that she lived in an apartment with her two children. She indicated that she was able to walk around the block, but while doing so, she was short of breath and her body started to ache. Ms. T. noted that her medications made her sleepy and dizzy. She reported losing her balance while climbing six flights of stairs. She also reported that she went grocery shopping and was able to complete household chores, but that she did not do yard work or work on cars. Ms.T. indicated that she slept six to seven hours each night and required rest

---

[79] The ALJ's first hypothetical was as follows:

> I have an individual of the claimant's age, education, past work experience, who'd be able to perform sedentary, light work—sedentary work as defined by the Social Security Administration, with only occasional climbing of ramps and stairs, stooping, kneeling, crouching, and crawling; with no climbing of ladders, ropes, or scaffolding. The person would have to avoid moderate exposure of non-weather-related extreme cold, and concentrated exposure to non-weather-related extreme heat, fumes, odors, dust, and poorly ventilated areas, unprotected heights, and hazardous machinery. A.R. 58.

[80] A.R. 55–59.

[81] The Exertional Activities Questionnaire is dated November 9, 2017 on the Court Transcript Index at Docket 11–2 at 2.

periods of two to three hours during the day. Ms. T. reported driving her children to school. She also reported that she wore a brace for her right middle finger.[82]

## IV. DISCUSSION

Ms. T. is represented by counsel in this appeal. In her opening brief, she asserts that the ALJ failed to "fully and fairly develop the record with respect to the appropriate residual functional capacity from the alleged onset date through 2018 at least."[83] The Commissioner concedes that the ALJ's "decision relied on incomplete opinions and did not clearly consider the entire record" and "agrees further proceedings would serve a useful purpose."[84] However, Ms. T. also argues that she "was disabled at least from her September 2017 alleged onset date through December 2018 during which she underwent two heart operations."[85]

### A. Medical Opinions and Development of the Record

Ms. T. argues that testifying expert Dr. Anderson's opinion of Ms. T.'s exertional limitations "was cursory with respect to the critically decisive period" of September 2017 through December 2018 and the ALJ failed "to account for treating surgeon Dr. Stephens's treatment notes."[86] The Commissioner concedes that the opinion evidence the ALJ relied upon was "incomplete" and that "the opinions were not entirely consistent

---

[82] A.R. 182–84.

[83] Docket 14 at 17.

[84] Docket 19 at 6.

[85] Docket 14 at 13.

[86] Docket 14 at 15–16.

with the ALJ's finding that [Ms. T.] was capable of a range of sedentary work activity between the alleged onset of disability, September 2017, and the ALJ's decision in March 2019."[87]  Specifically, the Commissioner notes that neither Dr. Anderson's opinion nor medical consultant Dr. Brown's opinion "considered the period between March 2018 and February 2019."[88]  The parties agree that the record was not fully developed by the ALJ.[89]

### 1. *Legal Standard*

The ALJ has an "independent duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[90]  However, an "ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."[91]  Further, "[a]n ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination."[92]

### 2. *Analysis*

Here, testifying expert Dr. Anderson acknowledged that in September 2017, Ms. D. "had rather significant cardiomyopathy and congestive failure," but went on to testify that she had no ongoing episodes or complaints of angina and her hypertension appeared

---

[87] Docket 19 at 2.

[88] Docket 19 at 3.

[89] Docket 14 at 17; Docket 19 at 2–3.

[90] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (internal citations and quotations omitted).

[91] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011) (internal citations omitted).

[92] *Bayliss v. Barnhart,* 427 F.3d 1211, 1217 (9th Cir. 2005); 20 C.F.R. §§ 404.1512(e), 416.912(e).

to be controlled with medication.[93]  However, the medical record shows a much more

complicated history.  For example, on September 17, 2017, Ms. T. had a "severely

decreased ejection fraction" of 15–20%.  The attending physician's diagnoses included

acute congestive heart failure and cardiomyopathy.[94]  A stress test MRI in October 2017

showed an ejection fraction of 27% and other cardiac abnormalities.[95]  In November 2017,

Ms. T. underwent three-vessel catherization and stenting.[96]  On April 18, 2018, Ms. T.

reported chest pressure lasting 10-15 minutes at least once a week and that she had

used nitroglycerine approximately five times in the past four months.[97]  By May 2018, Ms.

T.'s ejection fraction improved to 46%.[98]  In late August and early September 2018, Ms.

T. underwent eight vessel coronary artery bypass grafting.[99]  On September 20, 2018,

Ms. T. was instructed to "continue using sternal precautions for a full six weeks from the

date of surgery."[100]  In December 2018, Ms. T.'s primary care physician opined that Ms.

T. was not cleared to work due to her bypass surgery, hyperglycemia associated with

---

[93] A.R. 40–44.

[94] A.R. 230–53.

[95] A.R. 684–96.

[96] A.R. 404–10.

[97] A.R. 668–73.

[98] A.R. 664.

[99] A.R. 512–15.

[100] A.R. 531.

insulin dependent diabetes, chronic renal failure, and ongoing tobacco and marijuana use.[101]

As acknowledged by the Commissioner, consulting physician Dr. Brown's opinion was rendered before Ms. T. underwent eight vessel coronary artery bypass grafting, yet the ALJ found Dr. Brown's opinion "persuasive" to determine that Ms. T. was capable of sedentary work throughout the entire alleged disability time period.[102]  Ms. T.'s treating physician, Dr. Stephens, did not render a medical opinion as defined by the new regulations.[103]

---

[101] A.R. 745.

[102] A.R. 18–19, 22, 65–69, 512.  *See* Docket 19 at 3.

[103] A.R. 523–28.  *Compare* 20 C.F.R. § 404.1527 *with* 20 C.F.R. § 404.1513(a)(2).  The new regulations define a medical opinion as follows:

> A medical opinion is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
>
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
>
> (iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and
>
> (iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.  20 C.F.R. § 404.1513(a)(2).

The Court agrees that the opinion evidence the ALJ relied on was incomplete and the ALJ did not fully and fairly develop the record. Although the ALJ must consider the combined impact of all impairments throughout the disability determination period,[104] in this case, the ALJ's reliance on Dr. Anderson's and Dr. Brown's incomplete opinions regarding a critical time period within the overall disability determination period warrants remand.

B. Scope of Remand

The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation."[105] The court follows a three-step analysis to determine whether the case raises the "rare circumstances" that allow a court to exercise its discretion to remand for an award of benefits. "First, [the court] must conclude that 'the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.'"[106] "Second, [the court] must conclude that 'the record has been fully developed and further administrative proceedings

---

[104] *Vazquez v. Astrue,* 572 F. 3d 586, 596–97 (9th Cir. 2009); 20 C.F.R. § 404.1523 (effective March 27, 2017) (noting that the combined effect of all of the claimant's impairments will be considered "without regard to whether any such impairment, if considered separately, would be of sufficient severeity"); 20 C.F.R. § 404.1545 (a)(2) (2012) (noting that where a claimant has more than one impairment, the adjudicator will consider all of the them, even those that are not severe, in determining the claimant's RFC).

[105] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

[106] *Brown-Hunter v. Colvin,* 806 F.3d 487, 495 (9th Cir. 2015) (quoting *Garrison*, 759 F.3d at 1020).

would serve no useful purpose.'"[107]  "Where there is conflicting evidence, and not all essential factual issues have been resolved, a remand for an award of benefits is inappropriate."[108]  "Third, [the court] must conclude that 'if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.'"[109] But, "even if all three requirements are met, [the court] retain[s] 'flexibility' in determining the appropriate remedy" and "may remand on an open record for further proceedings 'when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act.'"[110]

Ms. T argues that this matter should be remanded for a *de novo* hearing and a new decision or alternatively, asks the Court to find Ms. T. disabled from "the alleged onset date through the 2018 post-operative Discharge period."[111]  In her reply brief, Ms. T. makes the argument that Ms. T. is disabled and this Court should "defer to the factfinder to properly adjudicate cessation of disability, if it has occurred at all."[112]  The Commissioner responds that the Court should reverse and remand the ALJ's decision for further proceedings and that Ms. T. has waived any argument in her reply brief that she is entitled to remand for calculation of benefits.[113]

---

[107] *Id.* (quoting *Garrison,* 759 F.3d at 1020).

[108] *Treichler*, 775 F.3d at 1101.

[109] *Brown-Hunter,* 806 F.3d at 495 (quoting *Garrison,* 759 F.3d at 1021).

[110] *Id.* (quoting *Garrison*, 759 F.3d at 1021).

[111] Docket 14 at 20.

[112] Docket 20 at 2.

[113] Docket 19 at 6 (citing *McKay v. Ingleson,* 558 F.3d 888, 891 n.5 (9th Cir. 2009).

Here, the Court has found that the ALJ did not provide legally sufficient reasons for finding Dr. Anderson's and Dr. Brown's opinions persuasive. The medical opinion evidence relied upon by the ALJ was incomplete. Additionally, given the nature of the medical record in this case, the ALJ may elect to bifurcate the disability determination period. Finally, Ms. T. did not clearly articulate a request for the calculation of benefits in her briefing nor did she provide legal authority or specific record support for such argument. Therefore, the case will be remanded for additional proceedings.

Upon remand, the ALJ will provide Ms. T. with an opportunity for a new hearing, submit new evidence in support of her claim, and will provide a new decision. The ALJ will take any steps necessary to fully and fairly develop the administrative record, including obtaining medical expert evidence specifically analyzing the time period from the alleged onset date of September 17, 2017 through the post-operative period following Ms. T.'s eight-vessel bypass surgery. The ALJ may bifurcate the disability determination period.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and the ALJ's decision is not supported by substantial evidence in the record. Accordingly, IT IS ORDERED that Ms. T.'s request for relief at Docket 14 is GRANTED IN PART and DENIED IN PART as set forth herein, the Commissioner's final decision is VACATED, and the case is REMANDED to the SSA for further proceedings consistent with this decision.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 13th day of February, 2020 at Anchorage, Alaska.

/s/ Timothy M. Burgess
TIMOTHY M. BURGESS
UNITED STATES DISTRICT JUDGE